———————————————————————  )
                          )
PERKINELMER HEALTH SCIENCES,   )
INC.,                     )
                          )
          Plaintiff,      )
                          )      Civil Action No.
     v.                   )      12-10562-NMG
                          )
AGILENT TECHNOLOGIES, INC.,    )
                          )
          Defendant.      )
———————————————————————  )

## MEMORANDUM & ORDER

**GORTON, J.**

Here we have a dispute over patent licensing fees due to plaintiff PerkinElmer Health Sciences, Inc. ("PerkinElmer") from defendant Agilent Technologies, Inc. ("Agilent"). Both parties are successors to the original parties to the license.[1] In 1997, a predecessor-in-interest to PerkinElmer granted a non-exclusive sublicense to a predecessor of Agilent. Although the case originally involved claims for patent infringement, those claims have been stayed and the case is now limited to the parties' contractual claims under two separate license agreements.

Although the parties have filed three motions for summary judgment, including hundreds of pages of briefing and a

---

[1] With few exceptions, for sake of clarity, the Court refers to Analytica of Branford, Inc. ("AoB") and PerkinElmer as "PerkinElmer" and Hewlett-Packard Co. ("HP") and Agilent as "Agilent."

concomitant number of exhibits, the issue before the Court is actually confined, in large part, to two relatively straightforward disputes.

First, the parties dispute whether PerkinElmer breached the so-called "Most Favored Nation" provisions in the Agilent License and a similar license with Varian, Inc. ("Varian") by failing to disclose licensing agreements with third parties.

Second, the parties disagree about whether Agilent's cessation of royalty payments in 2009, after having made such payments for more than a decade, was in breach of the Agilent License. That question turns in large part on defining the phrase "which is used for" in the Agilent License.

For the reasons that follow, the Court will deny both of Agilent's motions for summary judgment and will allow, in part, and deny, in part, PerkinElmer's motion for summary judgment.

I.   **Facts**

     A.   **The Patents and Technology**

In May 1989, three researchers working at Yale University ("Yale") applied for a patent pertaining to the analysis of charged ions. The United States Patent and Trademark Office ("the PTO") issued United States Patent No. 5,130,538 ("the '538 Patent") to those three researchers in July, 1992. The PTO issued two related patents, United States Patent Nos. 5,686,726 ("the '726 Patent") and 5,581,080 ("the '080 Patent"), to the

same researchers in December, 1996 and November, 1997 respectively.

The two patents at issue concern a method for conducting "mass spectrometry," a technique used to determine the molecular weight of a chemical compound.  Mass spectrometry begins when the subject compound is ionized, i.e. electrically charged, and then exposed to magnetic and/or electrical fields.  The different movements of ionized particles are charted and the molecular weight of a compound can then be determined.

Specifically, the two patents teach a method of mass spectrometry involving the use of electrospray ionization ("ESI") on large, biological molecules.  The '080 Patent describes the method by which the ESI technology works while the '726 Patent describes the composition of the matter created during the ESI process.

**B.  Contractual Relationships Among the Parties**

In March 1997, Yale granted an exclusive license of the '538 Patent and any subsequently issued, related patents to AoB and its successors.  The license agreement granted AoB an exclusive, world-wide license for the life of the patents.  The specific rights included the "sole right" to use the patents at issue for commercial purposes, to sublicense the patents and to sue, defend or settle any infringement action, bearing all the

expenses and retaining all recoveries resulting from those suits.

Also in March 1997, AoB granted a non-exclusive license ("the Agilent License") to sell products based upon the patents to HP which, in turn, assigned its rights under the agreement to its subsidiary, defendant Agilent. Agilent made royalty payments to AoB for the right to manufacture several devices that made use of that technology, including mass spectrometers.

In February, 2004, PerkinElmer entered into a licensing agreement with Varian ("the Varian License"). In May, 2010, Agilent acquired Varian.

AoB merged with and into PerkinElmer in 2009. On June 28, 2011, Agilent informed PerkinElmer that it would no longer make royalty payments under the Agilent License because it had determined that the '726 and '080 Patents were invalid due to double-patenting and because it had adopted a revised, "correct" interpretation of the agreement.

Following the Agilent License in 2010, PerkinElmer granted at least three licenses to third parties without providing notice to Agilent. Unlike the Agilent License which required a significant payment for each individual instrument or software product sold, the third party licenses to Shimadzu Corp. ("Shimadzu") and JEOL Ltd. ("JEOL") required only a $50,000 initial payment for a "paid-up license."

### C. The Agilent License

The Agilent License was entered into in March, 1997 between the predecessors-in-interest of PerkinElmer and Agilent and is governed by New York law. It describes a licensing agreement between the two companies that covers Licensed Products which are defined in Article 1.4 as

> any electrospray mass spectrometer apparatus sold or provided by [Agilent] to a CUSTOMER, who uses said LICENSED PRODUCT in the United States, and which is used for the production or analysis of multiply charged ions in a manner which but for this LICENSE AGREEMENT would infringe one or more VALID CLAIMS of LICENSED PATENTS.

The Agilent License contained two payment provisions. Under Article 3.1, Agilent was required to pay PerkinElmer $1,500 for each unit of licensed product and $5,000 for each software product sold in the United States. If Agilent sold fewer than a minimum number of software products during any three-year period, it would be required to make a minimum payment based on the product's historical sales.

In Article 9.1, the Agilent License required that

> If [PerkinElmer] has granted or grants to another person any license or other rights in, to or under any of the LICENSED PATENTS, [PerkinElmer] shall promptly notify [Agilent] in writing.

Article 9.2 then provides that if the outside counsel or a retained consultant of Agilent believes that the terms of a third party license are "more favorable" than those that are

applicable to Agilent, "a written statement so stating shall be provided to [Agilent] and [PerkinElmer]." That provision goes on to provide that:

> [i]f both parties agree that the terms of the third party license are, in their totality, more favorable to the grantee than those that are applicable to [Agilent] under this LICENSE AGREEMENT, [Agilent] shall have the right to elect to substitute the more favorable terms for the then-existing terms applicable to [Agilent].... If the parties disagree as to whether the terms of the third party license are, in their totality, more favorable, each party reserves its rights as to any remedies or means for resolution as are available.

**D.  The Varian License**

The Varian License was entered into in February, 2004 and is governed by Connecticut Law.  Its provisions largely mirror those of the Agilent License but differ in minor respects.

Significant to the dispute at hand, the Varian License defines the Licensed Product as

> any electrospray mass spectrometer apparatus sold or provided by VARIAN to a CUSTOMER, who uses said LICENSED PRODUCT in the United States, and which is used or has the capability of being utilized for the production or analysis of multiply charged ions in a manner which but for this LICENSE AGREEMENT would infringe one or more VALID CLAIMS of LICENSED PATENTS.

Article 9.1 of the Varian License states that

> If [PerkinElmer] has granted or grants to another person any license or other rights in, to or under any of the LICENSED PATENTS...wherein the payment amounts as set forth in Sections 3.1 and 4.1 herein are different then [sic] those set forth in this LICENSE AGREEMENT, [PerkinElmer] shall promptly notify VARIAN in writing.

-6-

In turn, Article 9.2 provides that any opinion that the terms of a third party license are more favorable to a grantee must be provided in writing to PerkinElmer. The remainder of that article is identical (except for the name of the licensee) to Article 9.2 of the Agilent License quoted above.

## II. **Procedural History**

PerkinElmer filed a two-count complaint in March, 2012, alleging that Agilent willfully and materially breached the Sublicense Agreement when it failed to make royalty payments in June, 2011 and continues to infringe the '726 and '080 Patents by manufacturing products that make use of those patents. PerkinElmer sought a declaratory judgment that Agilent is infringing, damages and injunctive relief.

Agilent moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) in June, 2012, on the grounds that PerkinElmer lacks standing to sue Agilent because it did not own all substantial rights to the patent. The Court heard argument on Agilent's motion in August, 2012, at the same time it entered a scheduling order. The motion was subsequently denied.

On October 2, 2012, PerkinElmer moved to amend the complaint in order (1) to add a breach of contract claim and (2) to revise its factual allegations to reflect the fact that Agilent is a successor in interest to the license agreement at issue in the case, rather than an original party. The Court

allowed that motion in January, 2013, and PerkinElmer filed an amended complaint. Agilent also filed an amended counterclaim.

With respect to the patent issues in this case, the Court held a <u>Markman</u> hearing in May, 2013 and issued its <u>Markman</u> order in June, 2013. That same month, the parties indicated that the patents would likely all be rejected by the USPTO as obvious or for double patenting and the Court entered a stay in August, 2013 of all patent-related proceedings pending the USPTO's reexamination.

The parties filed cross-motions for summary judgment with respect to the contract issues in February, 2014.[2] The Court held a hearing on the pending motions on September 4, 2014.

## III. **Analysis**

### A.  **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>*,* 950 F.2d 816, 822 (1st Cir. 1991) (citation omitted). To prevail, the moving party must show, through pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those

---

[2] The parties' arguments are spread across three summary judgment motions but the Court will divide its analysis into two parts according to the two main issues raised at this juncture.

that would affect the case's ultimate outcome. <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Factual disputes of merely ancillary interest will not preclude summary judgment. <u>Id.</u> A genuine issue of material fact exists where the evidence with respect to the disputed material fact "is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

At this stage, the Court views the entire record in the light most favorable to the non-moving party and makes all reasonable inferences in that party's favor. <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993). To evaluate cross-motions for summary judgment, the Court views each motion separately and applies the applicable presumptions accordingly. <u>Roman Catholic Bishop of Springfield</u> v. <u>City of Springfield</u>, 724 F.3d 78, 89 (1st Cir. 2013). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

### 1. Applicable Law

The substantive law applicable to the subject disputes is the basic contract law of the State of New York.[3]  In brief but pertinent part,

> [t]he elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages.

Niagara Foods, Inc. v. Ferguson Elec. Serv. Co., 975 N.Y.S.2d 280, 282 (App. Div. 2013).

Where the meaning of a contract is clear, "the construction of the contract presents a question of law to be determined by the court." AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 729 n.15 (2d Cir. 2010).  In all matters, the Court's purpose in construing a contract is to give effect to the "intent of the parties." Am. Express Bank, Ltd. v. Uniroyal, Inc., 164  A.D.2d 275, 277 (N.Y. App. Div. 1990).

### B. Alleged Violations of the "Most Favored Nation" Provisions in the Agilent and Varian Licenses

The question presented by Agilent's first motion for partial summary judgment (Docket No. 169) and part of PerkinElmer's motion for summary judgment (Docket No. 173) is whether the record establishes that PerkinElmer violated the so-called "Most Favored Nation" ("MFN") provisions in both the

---

[3]  The Varian License is governed by Connecticut law but it is in all relevant respects the same as that of New York state.

Agilent License and the Varian License, as alleged in Agilent's counterclaim Counts III and IV.  Agilent claims that the MFN clauses required PerkinElmer to give it the benefit of other bargains subsequently struck with third parties.

With respect to the Agilent License, Agilent argues that, in 2010, PerkinElmer granted two licenses to Agilent's competitors with more favorable terms than those in the Agilent license.  With respect to the 2004 Varian License, Agilent claims that it was violated when PerkinElmer failed to disclose to Varian the different terms of the Agilent License.[4]  Both actions, so Agilent asserts, constitute breaches of contract by PerkinElmer.

PerkinElmer responds that Agilent has failed to prove all of the elements of a breach of contract.  PerkinElmer relies principally upon the contention that the MFN provisions themselves are essentially unenforceable and therefore it cannot have breached an obligation it did not have.

### 1.    The Agilent License

The first task of the Court is to interpret the MFN clause at issue.

---

[4] Agilent subsequently acquired Varian, becoming its successor-in-interest.

The Court finds that the relevant provisions, Article 9.1 and 9.2, are unambiguous. According its plain text, Article 9.1 requires that, if PerkinElmer

> has granted or grants to another person any license or other rights [in the patents at issue, then it] shall promptly notify [Agilent] in writing [and then, upon request, provide the information to] an outside counsel or consultant of [Agilent's] choice.

The notification provision is mandatory and enforceable.

Article 9.2 presents a slightly different issue, however. Indeed, the Court concludes that it is unambiguous but, in contrast to Article 9.1, is clearly nugatory. Despite describing a detailed procedure involving an outside authority, the clause is enforceable only "[i]f both parties agree that the terms of the third party license are, in their totality, more favorable to the grantee" than the Agilent License. In fact, if the parties disagree, they are relegated to "any remedies or means for resolution as are available," i.e. litigation.

While Agilent protests that PerkinElmer's interpretation is an absurd result that the Court should avoid lest it render the clause inoperative, the Court sees no ambiguity, only poor draftsmanship. Agilent cogently points out that such an interpretation renders Article 9 "meaningless" but the Court will not presume to find a purse where there is only a sow's ear. The clearest example of the parties' intent, after all, is

the plain language of the text which here unambiguously requires PerkinElmer to notify Agilent but nothing more.

The Court acknowledges that the purpose of a MFN is to shield an earlier "licensee from a competitive disadvantage resulting from more-favorable terms granted to another licensee," Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 13 (2d Cir. 1997), but a party cannot simply convert a contract provision into a MFN clause by labeling it as such.

Having interpreted the relevant provisions, the Court turns to Agilent's claim that PerkinElmer breached the Agilent License. Here, the Court finds that 1) Agilent has demonstrated that a contract existed, 2) Agilent performed under the contract and 3) PerkinElmer breached the contract. PerkinElmer concedes that it failed to notify Agilent of its third party licenses with Shimadzu and JEOL.

Although PerkinElmer argues that Agilent should not be able to enforce the contract when it was in material breach of its own obligations, the Court does not credit that argument. PerkinElmer contends that Agilent's alleged failure to pay royalties for the Triple Quad Instruments and other products was a material breach which excuses any subsequent breach by PerkinElmer. While a material breach can excuse non-performance, a breach justifies rescission only if it is "so

-13-

substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." Nolan v. Sam Fox Publ'g Co., 499 F.2d 1394, 1399 (2d Cir. 1974).  New York courts, however, have held that the partial underpayment of royalties does not constitute a material breach. See Jobim v. Songs of Universal, Inc., 732 F. Supp. 2d 407, 421-22 (S.D.N.Y. 2010).

In this case, even assuming that Agilent has failed to pay royalties for a brief period at the end of the agreement's lifespan, such a failure is not "substantial and fundamental" to the agreement's purpose.  Rescission is an "extraordinary remedy" unwarranted here. Nolan, 499 F.2d at 1397.

Second, PerkinElmer argues that Agilent has failed to prove any breach of its obligation to remedy third-party infringement by what PerkinElmer calls "small infringers."  That argument is a distraction at best, however, because PerkinElmer merely mentions it in passing to illustrate a different point.

Accordingly, the only remaining question is whether, at the summary judgment stage, a contract clause that offers the opportunity to negotiate but is otherwise unenforceable can provide the basis for damages on a claim for breach of contract.

PerkinElmer contends that Agilent cannot prove damages as a result of the purported breach of the MFN clause in the Agilent License because Agilent did not unilaterally have the right or

opportunity to substitute more favorable terms.  While the Court
again acknowledges that PerkinElmer's interpretation vitiates
Article 9.2 of the Agilent License, Agilent asserts only that
its damages emanate from the lower royalty rate paid by its
competitors which rate was not made available to Agilent.[5]  Those
purported damages depend, however, on the enforceability of
Article 9.2, not on the notice procedures in Article 9.1.

Viewing the entire record in the light most favorable to
PerkinElmer, Agilent's motion for partial summary judgment for
breach of contract will be denied.  Similarly, viewing the
record most favorably to Agilent, PerkinElmer's motion for
summary judgment will be allowed and, accordingly, Agilent's
counterclaim Count IV will be dismissed.

## 2.  The Varian License

The Court faces a similar task with respect to the Varian
License.  That dispute centers on the difference between the
2004 Varian License and the 1997 Agilent License and the failure
of PerkinElmer to alert Varian of the existence of the Agilent
License.  In a convoluted twist of circumstance owing to its
acquisition of Varian in 2010, Agilent seeks recovery under the

---

[5] The Court need not address PerkinElmer's contention that the
Agilent License was not, in fact, "less favorable" than the
Shimadzu and JEOL licenses because of its finding that the so-
called MFN clause is unenforceable.

Varian License which was purportedly violated by PerkinElmer when it granted a license to Agilent.

As an initial matter, the Court must interpret the MFN clause in the Varian License. In contrast to the Agilent License, Article 9.1 of the Varian License requires prompt written notice only when PerkinElmer

> has granted or grants to another person any license or other rights [in the patents at issue] wherein the payment amounts as set forth in Sections 3.1 and 4.1 herein are different th[a]n those set forth

in the Varian License. While that notification provision is similar to that in the Agilent License in that it is mandatory and enforceable, its plain terms apply only to third-party license agreements where the royalty amounts differ from those agreed to in the Varian License.

That interpretation, based on the plain text of Article 9.1 of the Varian License, allows the Court to short-cut its analysis and determine the difference in the "payment amounts" in the two licenses.

The parties agree that the general structure of the licenses and the payment amounts are the same but Agilent claims that the agreements are not identical because the "definitions of Licensed Product" differ which, in turn, affects how payment is to be rendered.

The definition of Licensed Product in the Agilent License
is

> any electrospray mass spectrometer apparatus sold or
> provided by [Agilent] to a CUSTOMER, who uses said
> LICENSED PRODUCT in the United States, and which is
> used for the production or analysis of multiply
> charged ions in a manner which but for this LICENSE
> AGREEMENT would infringe one or more VALID CLAIMS of
> LICENSED PATENTS.

The definition in the Varian License is almost identical but adds the phrase "or has the capability of being utilized for" after "which is used." In keeping with the arguments levied in the parties' other dispute, Agilent argues that this creates a significant difference between the two licenses and, in turn, would have required notice be given to Varian in writing.

As the Court notes in more detail below with respect to the parties' other dispute over the phrase "which is used for," Agilent's argument attempts to make a contractual mountain out of a semantic molehill. Agilent makes much of the difference in wording but it is abundantly clear, based upon approximately 12 years of conduct between the parties in this case, that the phrase "which is used for" was interpreted to have the same meaning as "which has the capability of being utilized for."

PerkinElmer also makes two cursory arguments that can be disposed of in short order. It notes that Agilent cannot represent Varian's interests because it cannot prove it is a party to the Varian License and that Agilent has failed to prove

that Varian performed under the licensing agreement.  No evidence proffered by PerkinElmer, however, supports either proposition, even at the summary judgment stage.

Accordingly, because no genuine issue of material fact has arisen, Agilent's motion for summary judgment with respect to the claimed violation of the MFN clause in the Varian License will also be denied.  Similarly, the Court will allow PerkinElmer's motion for summary judgment and dismiss Agilent's counterclaim Count III.

### C. Alleged Violation of the Article 1.4 of the Agilent License

In the remainder of PerkinElmer's motion for summary judgment (Docket No. 173) and Agilent's second motion for partial summary judgment (Docket No. 177), the parties dispute whether Agilent was required to pay royalties for any instrument "which is used for" infringing activities.  Key to that argument is whether the phrase "which is used for" in Article 1.4 of the Agilent License means "actually being used for" or simply "capable of being used for."  In addition, the parties contend, respectively, that PerkinElmer is owed damages for Agilent's failure to pay royalties from 2009 until 2011 and that PerkinElmer must repay all of Agilent's "overpayments" from 1997 to 2009.

## 1.  "Which is Used For"

PerkinElmer argues that it is entitled to damages for the underpayment of Triple Quad instrument royalties.  Article 1.4 of the Agilent License describes a "Licensed Product" as

> any electrospray mass spectrometer apparatus sold or provided by [Agilent] to a CUSTOMER, who uses said LICENSED PRODUCT in the United States, and which is used for the production or analysis of multiply charged ions in a manner which but for this LICENSE AGREEMENT would infringe one or more VALID CLAIMS of LICENSED PATENTS.

From 1997 to 2009, Agilent paid PerkinElmer royalties based on its understanding that a Licensed Product consisted of any instrument which was capable of generating multiply charged ions, rather than an instrument that in fact generated such ions.  That implicates several of Agilent's products but specifically its Triple Quad Instruments.

In 2009, however, Agilent revised its interpretation and adopted a "correct" understanding that the phrase "which is used for" implied that to fall within this clause, the instrument must actually be used for the production or analysis of multiply charged ions.  Agilent did not alert PerkinElmer of that change but continued to pay royalties based on its "correct" understanding until 2011, when it ceased paying any royalties based on its position that the patents at issue were invalid. Only when the present litigation began did PerkinElmer learn about the revised understanding Agilent adopted in 2009.

In support of its contention that the phrase "which is used for" implies actual use as a matter of law, Agilent points to the plain meaning of the word "use," the drafting history of the agreement and the supposed "commercial unreasonableness" of PerkinElmer's interpretation.  PerkinElmer responds in kind, arguing that the text's plain meaning supports its proposed interpretation but also that the parties' long course of conduct and the history of negotiation constitute extrinsic evidence to support its position.

Having reviewed all of the parties' submissions in this case, the Court believes that ascertaining the plain meaning of the phrase "which is used for" is a relatively simple exercise. Here, the Court concludes that the phrase implies potential use, not actual use.

As an initial matter, the Court notes that the dictionary definition of the word "use" is not particularly helpful in deciphering the meaning of such a common word in the context of a patent license agreement.  As a matter of common usage, a phrase such as "is used often," with its temporal adverb, implies frequent, <u>actual</u> use, while the phrase "is used for," lacking such a temporal element, implies potential uses, especially when followed by a verb.

Moreover, it is instructive to discuss briefly the origins of the Agilent License.  Obviously, absent actual infringement,

Agilent would not have needed to pay PerkinElmer.  According to the undisputed facts of this case, however, a significant issue in the drafting of the Agilent License was how to measure the actual infringing use of Agilent's customers because ESI-MS instruments can be used in different ways, both infringing and non-infringing.

Therefore, the parties faced a dilemma: either measure the actual use of Agilent's customers in order to determine infringement or adopt a compromise to obviate the need to make such measurements.  According to the parties' undisputed submissions, determining how an end user operates the subject instruments was, and remains, practically impossible absent an onerous (and expensive) monitoring system.  Thus, the Agilent License reflected a compromise with respect to the measurement problem: all instruments capable of infringing would be assumed to infringe.  That logic confirms the Court's understanding of the plain language of Article 1.4 of the Agilent License.

Finally, even assuming that the subject language were not abundantly clear, any remaining doubt is readily overcome by examining the extrinsic evidence.  Here, the fact that the parties to the agreement at issue interpreted it as indicating only potential use for the first 12 years of the its existence is decisive.  If "there is no surer way to find out the intent of the parties than to see what they have done," New York Marine

-21-

& Gen. Ins. Co. v. Lafarge North America, Inc., 599 F.3d 102, 119 (2d Cir. 2010), then a dozen years of conduct is surely all but conclusive.  Accordingly, on top of the Court's conclusion that the subject language is unambiguous, the Court notes that the extrinsic evidence in the record at summary judgment also supports its interpretation.

### 2. Agilent's Alleged Overpayment of Royalties between 1997 and 2009

Having interpreted the contractual language, the Court turns to the parties' cross-motions for summary judgment with respect to that language.

First up are the parties' motions for summary judgment on Agilent's counterclaim Counts I and II, in which Agilent claims that it should receive either a credit against any potential damages or recoupment for all of its "overpayments" from 1997 to 2009.  The Court need not tarry here because Agilent's counterclaims on that issue depend entirely on its revised, "correct" interpretation of the contractual language in Article 1.4 of the Agilent License.  Because the Court concludes that the phrase "which is used for" means potential use, not actual use, Agilent cannot, however, receive any credit or recoupment.

Accordingly, with respect to Agilent's counterclaim Counts I and II, the Court will allow PerkinElmer's motion for summary judgment and deny Agilent's motion for summary judgment.

### 3. Agilent's Alleged Failure to Pay Royalties between 2009 and 2011

Next up is PerkinElmer's motion for summary judgment that it is entitled to damages for Agilent's failure to pay royalties from 2009 to 2011 based on its revised interpretation of the Agilent License. Here, just as before, interpreting the relevant contractual language performs the analytical legwork with respect to PerkinElmer's motion. The Court concluded that the phrase "which is used for" means potential use and thus Agilent's undisputed failure to pay royalties on instruments capable of infringing was in violation of the Agilent License. On that issue, no other dispute of fact has arisen, so the Court will allow PerkinElmer's motion for summary judgment against Agilent for its failure to pay royalties between 2009 and 2011 on instruments capable of infringing the patents at issue.

### 4. Differentiating the Products Allegedly Capable of Infringing

#### a. Instruments

Although the Court's holdings are clear, the parties' arguments differentiate several of the instruments sold by Agilent. First, it is undisputed that the Triple Quad instrument, the most contested mechanism, was capable of infringement.

While the parties agree that the Triple Quad instrument is capable of infringing the patents at issue, that instrument is

not the only contested product.  Specifically, the parties also dispute whether the "Chip Cube" is capable of infringement. They have presented fact-intensive contentions as to the Chip Cube's functions.  PerkinElmer asserts that it infringes as an ESI mass spectrometer but Agilent responds that it constitutes only one part of an instrument that is only capable of infringing if it includes a Chip Cube.  The debate centers on whether the Chip Cube is capable, by itself, of generating ions. In light of the parties' arguments, the Court concludes that a genuine issue of a material fact precludes summary judgment with respect to the Chip Cube.

Finally, PerkinElmer contends that Agilent has failed to pay royalties on 318 other instruments.  Agilent resolutely denies that it owes any such royalties.  Although that dispute appears to involve accounting differences rather than a technology-based argument, the Court concludes that the arguments on that issue are underdeveloped and not susceptible of summary judgment.

### b.    Software

The parties dispute whether royalties (or, supply contract payments, as PerkinElmer contends) are owed on Agilent's sales of software products.  Here again, the arguments are insufficiently developed for the Court to enter summary judgment with respect to either of the two software products at issue,

the Protein Deconvolution software and the BioConfirm software.
As Agilent notes, there is precious little evidence on the
record with respect to how those products operate and, in any
event, not enough for the Court to enter judgment while weighing
the record in favor of the respective non-moving party.

Accordingly, the Court finds that a genuine issue of
material fact precludes summary judgment with respect to the
issue of royalty payments for Agilent's sales of software
products.

**ORDER**

For the foregoing reasons,

1) the motion of Defendant Agilent Technologies, Inc. for partial summary judgment for breach of contract (Docket No. 169) is **DENIED;**

2) the motion of Plaintiff PerkinElmer Health Sciences, Inc. for summary judgment (Docket No. 173) is **ALLOWED, in part,** and **DENIED, in part,** as follows:

  a. the motion for summary judgment on defendant's Counterclaim Counts I, II, III and IV is **ALLOWED;** and

  b. the motion for summary judgment on Count III of plaintiff's Second Amended Complaint is, with respect to sales of Triple Quad instruments, **ALLOWED,** but is, with respect to all other instruments and software products, **DENIED;**

3) the motion of Defendant Agilent Technologies, Inc. for partial summary judgment that Agilent is entitled to a credit for or recoupment of overpayments (Docket No. 177) is **DENIED;** and

4) Counts I, II, III and IV of Agilent Technologies, Inc.'s Counterclaim are **DISMISSED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated September 24, 2014